IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS

| | |
|---|---|
| USTA TECHNOLOGY, LLC,<br><br>　　　　　　Plaintiff,<br><br>　v.<br><br>T-MOBILE USA, INC.,<br><br>　　　　　　Defendant. | Civil Action No. 4:25-cv-820<br><br>JURY TRIAL DEMANDED |

**COMPLAINT FOR PATENT INFRINGEMENT**

Plaintiff USTA Technology, LLC ("USTA" or "Plaintiff") files this original complaint against Defendant T-Mobile USA, Inc. ("T-Mobile" or "Defendant"), alleging, based on its own knowledge as to itself and its own actions and based on information and belief as to all other matters, as follows:

**NATURE OF THE ACTION**

1. This is an action for patent infringement arising under the Patent Laws of the United States, 35 U.S.C. § 1 *et seq*.

**THE PARTIES**

2. Plaintiff USTA is a limited liability company organized under the laws of the State of Delaware with a place of business at 211 W Tyler St., Ste. C, Longview, TX  75601.

3. Defendant T-Mobile USA, Inc. ("T-Mobile USA") is a corporation duly organized and existing under the laws of the State of Delaware.  It has a place of business at 3560 Dallas Parkway, Frisco, Texas 75034. T-Mobile USA may be served with process through its registered agent, Corporation Service Company d/b/a CSC - Lawyers Incorporating Service Company at 211 E. 7th Street, Suite 620 Austin, TX 78701.

4. Upon information and belief, T-Mobile sells, offers to sell, and/or uses products and services throughout the United States, including in this judicial district, and introduces infringing products and services into the stream of commerce knowing that they would be sold and/or used in this judicial district and elsewhere in the United States.

## JURISDICTION AND VENUE

5. This is an action for patent infringement arising under the Patent Laws of the United States, Title 35 of the United States Code.

6. This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1338(a).

7. Venue is proper in this judicial district under 28 U.S.C. § 1400(b).

8. Defendant is subject to this Court's personal jurisdiction consistent with the principles of due process and/or the Texas Long Arm Statute.

9. Furthermore, this Court has general and specific personal jurisdiction over the Defendant under the laws of the State of Texas, due at least to their substantial business in Texas and in this judicial district, directly or through intermediaries, including: (i) at least a portion of the infringements alleged herein; and (ii) regularly doing or soliciting business, engaging in other persistent courses of conduct and/or deriving substantial revenue from goods and services provided to individuals in the State of Texas. T-Mobile has purposefully availed itself of the privileges of conducting business in the State of Texas and in this judicial district. Venue is also proper in this district because T-Mobile has a regular and established place of business and has committed acts of infringement in this district.

10. This Court has personal jurisdiction over T-Mobile under the laws of the State of Texas, due at least to its substantial business in Texas and in this judicial district, directly or through intermediaries, including: (i) at least a portion of the infringements alleged herein; and (ii) regularly doing or soliciting business, engaging in other persistent courses of conduct and/or

deriving substantial revenue from goods and services provided to individuals in the State of Texas and in this District.

  11. For example, T-Mobile maintains brick and mortar retail stores in this District located, among other places, in Marshall (e.g., 1806 E End Blvd N, Ste 100, Marshall, TX 75670), Longview (e.g., 2108 Gilmer Rd, Longview, TX 75604; and 116 E Loop 281, Ste 101, Longview, TX 75605), Tyler (e.g., 8942 S Broadway Ave, Ste 104, Tyler, TX 75703; 3320 Troup Hwy, Tyler, TX 75701; 3840 State Hwy 64 W, Tyler, TX 75704; and 1400 W Southwest Loop 323, Ste 70, Tyler, TX 75701), Beaumont (e.g., 5899 Eastex Freeway, Suite 100, Beaumont, TX 77706; 3870 College St, Ste 100, Beaumont, TX 77701; and 5885 Eastex Fwy, Beaumont, TX 77706), Lufkin (e.g., 2906 Brentwood Dr, Ste 200, Lufkin, TX 75901), Sherman (e.g., 405 N US Hwy 75, Sherman, TX 75090), Texarkana (e.g., 4210 Saint Michael Dr, Texarkana, TX 75503; 3741 Mall Dr, Texarkana, TX 75501; and 2004 St Michael Dr, Texarkana, TX 75503), Plano (e.g., 2800 N Central Expy, Plano, TX 75074; 1110 Parker Road East, Suite C, Plano, TX 75074; 1701 Dallas Pkwy, Plano, TX 75093; 7000 Independence Parkway, Suite 168, Plano, TX 75025; 1913 Preston Rd, Ste 100, Plano, TX 75093; and 5800 Legacy Dr, Suite C-9, Plano, TX 75024), McKinney (e.g., 1751 N Central Expy, Mckinney, TX 75070; 3650 W University Dr, Mckinney, TX 75071; 2811 Craig Dr, Ste 104, Mckinney, TX 75070; 3009 S Custer Road #300, Mckinney, TX 75070; 1521 W University Dr 130, Mckinney, TX 75069; and 8910 State Hwy 121, Suite 200, Mckinney, TX 75070), and Frisco (e.g., 3333 Preston Rd, Frisco, TX 75034; 5722 Eldorado Pkwy, Suite 120, Frisco, TX 75033; 2155 University Dr, Ste 150, Frisco, TX 75033; 7135 Preston Rd, Ste 200, Frisco, TX 75034; 2601

Preston Rd, Space #2200, Frisco, TX 75034; and 252 W Stonebrook Pkwy, Suite 570, Frisco, TX 75034).[1]

12.     T-Mobile also maintains a regular and established place of business in this District, including but not limited to multiple "T-Mobile Corporate Offices" located in Frisco, Texas, including at 7668 Warren Pkwy, Frisco, TX 75034, and at 3560 Dallas Pkwy, Frisco, TX 75034.[2]

13.     T-Mobile has numerous employees who work in Texas, including within the Eastern District of Texas.  In addition to its many retail stores in Texas and in this District, T-Mobile, including at T-Mobile's many retail stores throughout the Eastern District of Texas and corporate offices in Frisco, Texas (as discussed above).

14.     T-Mobile has solicited business in the Eastern District of Texas, has transacted business within this District, and has attempted to derive financial benefit from the residents of this District, including benefits specifically related to T-Mobile's infringement of the Patents-In-Suit.

15.     In other recent actions, T-Mobile has either admitted or not contested that the Eastern District of Texas is a proper venue for patent infringement actions against T-Mobile. *See, e.g., Wireless Alliance, LLC v. T-Mobile US, Inc. and T-Mobile USA, Inc.,* No. 2:23-cv-00096, Dkt. 14 at ¶ 3, n.3 (E.D. Tex. May 26, 2023) ("T-Mobile does not contest . . . . venue is proper in this District . . . ."); *Solstice Wireless LLC v. T-Mobile USA, Inc.,* No. 4:22-cv-00723, Dkt. 8 at ¶ 25 (E.D. Tex. Nov. 7, 2022) ("Defendants do not contest that venue is proper as to T-Mobile USA."); *Innovative Sonic Ltd., et. al. v. T-Mobile USA, Inc.,* No. 2:23-cv-00490, Dkt. 31

---

[1] *See*, *e.g.*, https://www.t-mobile.com/stores/locator.
[2] *See* https://www.google.com/maps/search/t-mobile+corporate+office,+in+frisco,+tx/.

at ¶ 9 (E.D. Tex. Jan. 18, 2024) ("T-Mobile . . . . does not contest that venue is proper in this district.").

## BACKGROUND

16. Jerry D. Burchfiel is the inventor of U.S. Patent No. RE47,720 ("the '720 patent"). A true and correct copy of the '720 patent is attached as Exhibit 1.

17. The '720 patent resulted from the pioneering efforts of Mr. Burchfiel (hereinafter "the Inventor") in the area of spectrum management in wireless networking systems. These efforts resulted in the development of a method and apparatus for increasing the available spectrum in a wireless network by sharing existing allocated (and in-use) portions of the RF spectrum in a manner that will minimize the probability of interfering with existing legacy users in 2002. At the time of these pioneering efforts, there was increasing demand for spectrum-based services and devices to address decreasing wireless communications network bandwidth. Moreover, managing interference levels was made particularly difficult by the greater density, mobility and variability of "next generation" (XG) radio frequency emitters. (*See* '720 patent at 1:19-34.)

18. While the then-existing solutions for spectrum management to address increasing demand for spectrum-based services and devices sought to assign locally unoccupied portions of the RF spectrum to XG users, the FCC Spectrum Management Policy Task Force recommended that secondary users of a band are required to accept interference from primary users, and must cause no "harmful" interference to the primary users. The Task Force policy permitted secondary (e.g., unlicensed) users to radiate only enough power in an area of interest to raise the interference temperature in the band to a specified threshold $T_0$ for the band, service, and locality, and would create an opportunity to "underlay" existing primary applications with low-

power, low-impact opportunistic applications that operate below the threshold.  (*See* '720 patent at 1:35-53.)

19. However, the Spectrum Policy Task Force Report did not address how to build and configure networks and devices that comply with the proposed rules.  Accordingly, the Inventor conceived of the inventions claimed in the '720 patent as a way to describe tools, devices and applications XG users can build, configure and deploy in order to take advantage of the proposed spectrum policies.  (*See* '720 patent at 1:54-62.)

20. For example, the Inventor conceived of a node of a network communications system that could be configured to:

    (a) Continuously carry out real-time sensing and characterization of the local spectrum usage by (potentially interfering) narrowband and-wideband emitters;

    (b) Dynamically and autonomously adapt (on a time scale of milliseconds) to the local spectrum environment by selecting and controlling the waveforms (power spectral density (PSD) and Media Access Control (MAC) protocols) that its network neighbors use when transmitting to this node;

    (c) Automatically carry out a closed loop power control algorithm with each neighbor to throttle back on unnecessarily high power levels, thereby enhancing Low Probability of Detection (LPD);

    (d) Apply transmission security ("TRANSEC") parameters to the spread spectrum modulation process in order to enhance Low Probability of Intercept (LPI); and/or

        (e)        Carry out packet forwarding (routing) in a way that balances aggregate network throughput against average end-to-end delay. (This results in real time traffic, e.g., voice, being sent with higher power, minimizing latency due to channel access delays at multiple hops, and bulk traffic being sent with lower power, minimizing network self-interference, maximizing spatial reuse of frequencies and enhancing LPI/LPD).

(*See* '720 patent at 2:12-38.)

      21.     The inventions of the '720 patent also provide a way to underlay new services on then-existing bandwidth allocations with minimal or no interference to, and from, existing legacy users, by underlaying spectrum-efficient megabit rate networking onto bands allocated for other purposes, while providing up to 30 times greater throughput than then-current spectrum management systems. (*See* '720 patent at 2:7-11.) For example, military networking could underlay any narrowband-channelized spectrum where individual channels have less than 100% duty cycle, such as in commercial cellular, without interfering with existing legacy users of these bands. At the same time, the flexible hardware and software made possible by the inventions of the '720 patent will also operate in other frequencies without hardware modification when necessary, such as in overseas locations and in wartime. (*See id.* at 2:49-64.)

      22.     The inventions of the '720 patent address individual spectrum management devices and provide an integrated system concept for dynamic, adaptive, radio frequency spectrum assignment and use. The result is far greater spectrum efficiency, providing megabit/sec rate communications networks that can extend far beyond the capabilities of then-existing wireless networking systems and devices. (*See* '720 patent at 1:66-2:7.)

23. Moreover, the design of the highly advanced networking communications architecture described and claimed by the '720 patent combines dynamic spectrum management techniques with matching adaptive networking and full exploitation of multiple transceivers per communications node.  The inventions of the '720 patent thus provide increased flexibility and scalability, and may be easily adapted for use with other forward-looking wireless communications systems and technologies.  (*See* '720 patent at 2:39-48.)

24. The claims of the '720 patent do not merely recite the performance of some well-known business practice from the pre-Internet world along with the requirement to perform it on the Internet.  Instead, the claims of the '720 patent recite inventive concepts that are deeply rooted in engineering technology, and overcome problems specifically arising out of how to design and develop tools, devices and applications that take advantage of the spectrum management policies proposed by the FCC Spectrum Management Policy Task Force.  (*See* '720 patent at 1:54-62.)

25. In addition, as set forth, the claims of the '720 patent recite inventive concepts that improve the functioning spectrum management in wireless local area networking systems.  The inventive concepts recited by the claims of the '720 patent are not merely routine or conventional use of wireless networking technology.  Instead, the patented inventions disclosed and claimed in the '720 patent provide a new and novel solution to specific problems related to improving spectrum management in wireless networks in light of the rapidly increasing number and complexity of "next generation" (XG) radio frequency emitters in or around 2002.  (*See* '720 patent at 1:19-34.)

26. And finally, the patented inventions disclosed and claimed in the '720 patent do not preempt all the ways of improving spectrum management in wireless networks, nor does the '720 patent preempt any other well-known or prior art technology.

27. Accordingly, the claims in the '720 patent recite a combination of elements sufficient to ensure that the claim in substance and in practice amounts to significantly more than a patent-ineligible abstract idea.

28. The Institute of Electrical and Electronics Engineers (IEEE) is a leading standards-development organization for the development of industrial standards (having developed over 900 active industry technical standards) in a broad range of disciplines, including electric power and energy, telecommunications, consumer electronics, biomedical technology and healthcare-information technology, information assurance, transportation, aerospace, and nanotechnology.

29. Today, IEEE is the world's largest association of technical professionals with more than 420,000 members in over 160 countries around the world.  Its objectives are the educational and technical advancement of electrical and electronic engineering, telecommunications, computer engineering, and allied disciplines.

30. The IEEE 802.11 standards, created by the IEEE, are a set of media access control (MAC) and physical layer (PHY) specifications for implementing wireless local area network (WLAN) computer communication in the 900 MHz and 2.4, 3.6, 5, and 60 GHz frequency bands.

31. The IEEE 802.11 standards are created and maintained by the IEEE LAN/MAN Standards Committee (IEEE 802).  The base version of IEEE 802.11 was released in 1997 and

has had subsequent amendments. The standard and amendments provide the basis for wireless network products using the Wi-Fi brand.

32. IEEE Std. 802.11-2016, commonly shortened to 802.11-2016, is a revision based on the IEEE 802.11-2012 wireless-networking standard, and further incorporates five amendments, including 802.11ac-2013 (commonly shortened to 802.11ac).

33. 802.11ac is an amendment to IEEE 802.11, published in December 2013, and builds on 802.11n. The goal of 802.11n was to improve network throughput over the two previous standards—802.11a and 802.11g—with a significant increase in the maximum net data rate from 54 Mbit/s to 600 Mbit/s (slightly higher gross bit rate, including, for example, error-correction codes, and slightly lower maximum throughput) with the use of four spatial streams at a channel width of 40 MHz.

34. Changes in 802.11ac compared to 802.11n include wider channels (80 or 160 MHz versus 40 MHz) in the 5 GHz band, more spatial streams (up to eight versus four), higher-order modulation (up to 256-QAM vs. 64-QAM), and the addition of Multi-user MIMO (MU-MIMO). While initial implementations supported 80 MHz channels, three spatial streams, and 256-QAM, in 80 MHz channels in the 5 GHz band, more recent devices support 160 MHz channels, four spatial streams, and MU-MIMO.

35. The 802.11ac standard has enabled increased efficiency, as evidenced by the fact that most high-end, Wi-Fi-enabled consumer electronics on the market are 802.11ac compliant. The majority of products adopting this technological advance are advertised as being compliant with the standard, and companies regularly list their product as compliant with this particular standard on trade group web sites (such as the Wi-Fi Alliance website).

## COUNT I – INFRINGEMENT OF U.S. PATENT NO. RE47,720

36. The allegations set forth in the foregoing paragraphs 1 through 35 are incorporated into this First Claim for Relief.

37. On November 5, 2019, the '720 patent was duly and legally issued by the United States Patent and Trademark Office under the title "Spectrum-Adaptive Networking."

38. USTA is the assignee and owner of the right, title and interest in and to the '720 patent, including the right to assert all causes of action arising under said patent and the right to any remedies for infringement of it.

39. The inventions claimed in the '720 patent relate to technologies for radio frequency spectrum management in a wireless local area network system. Such technologies are a required part of the very-high throughput ("VHT") beamforming protocols of the 802.11ac standard, subsequently incorporated into 802.11-2016. Accordingly, devices supporting the 802.11ac standard necessarily meet the claim limitations of the '720 patent.

40. Upon information and belief, Defendant has and continues to directly infringe one or more claims of the '720 patent by selling, offering to sell, making, using, and/or providing and causing to be used 802.11ac-compliant products (the "Accused Instrumentalities").

41. For example, Defendant makes, uses and sells at least the following products that qualify as Accused Instrumentalities: T-Mobile 5G Gateway (G4AR & G4SE), TMO-G5AR, Sagemcom Fast 5688W Gateway, Arcadyan KVD21 Gateway, Nokia 5G21 Gateway, Askey Wi-Fi Gateway, T-Mobile Hotspots (e.g., Inseego MiFi® X PRO 5G, Quanta D53), T-Mobile Cellspot, Cradlepoint E320 router, Cradlepoint E300 router, Cradlepoint X10 Router series, Inseego FX4100, Inseego FX3100, Inseego FX2000, Cisco Meraki access points, Wi-Fi extenders and Mesh access points (including WE620443-T0 and WE8214443-T0 devices).

42. The Accused Instrumentalities include any and all products that Defendant has or continues to make, use, sell, import and/or provide and cause to be used that incorporate the wideband channel access features of the 802.11ac standard, whether certified for 802.11ac or other versions of the 802.11 standard, including via backwards compatibility with 802.11ac (e.g., 802.11ax, 802.11be).

43. Upon information and belief, the Accused Instrumentalities perform a method for managing interference in a radio communications network, comprising the steps of: receiving at a first node in the radio communications network an instruction transmitted from a second node in the radio communications network to avoid using a plurality of frequencies to transmit to the second node; filtering a transmission signal to remove power from the transmission signal at each frequency in the plurality of frequencies to be avoided; and transmitting the filtered transmission signal to the second node; separately from the receipt of the instruction, receiving a compressed first feedback from the second node that is based on a received power and one or more frequencies of a first signal transmitted from the first node to the second node; separately from the receipt of the instruction, receiving a compressed second feedback from a third node that is based on a received power and one or more frequencies of a second signal transmitted from the first node to the third node; decompressing the compressed first feedback resulting in a decompressed first feedback; decompressing the compressed second feedback resulting in a decompressed second feedback; generating one or more data structures based on the decompressed first feedback and the decompressed second feedback; wherein the filtered transmission signal is a filtered first transmission signal that is transmitted using a first frequency and an 802.11-based orthogonal frequency-division multiplexing (OFDM) protocol via at least one antenna of a plurality of antennas, using a first power that is based on at least one of the one

or more data structures; and further comprising: transmitting, using a second frequency and the 802.11-based OFDM protocol, a filtered second transmission signal, simultaneously with the filtered first transmission signal, to the third node, using a second power that is based on at least one of the one or more data structures.

44. Exemplary infringement analysis showing infringement of claim 19 of the '720 patent is set forth in Exhibit 2. This infringement analysis is necessarily preliminary, as it is provided in advance of any discovery provided by Defendant with respect to the '720 patent. USTA reserves all rights to amend, supplement and modify this preliminary infringement analysis. Nothing in the attached chart should be construed as any express or implied contention or admission regarding the construction of any term or phrase of the claims of the '720 patent.

45. On information and belief, Defendant uses one or more of the Accused Instrumentalities to offer its 5G Home Internet service, which practices one or more claims of the '720 patent when used by Defendant.[3] Defendant encourages customers and other end-users to utilize its 5G Home Internet service rather than conventional internet services.[4]

46. On information and belief, Defendant conducts internal testing of the Accused Instrumentalities which includes practicing one or more claims of the '720 patent.[5]

47. On information and belief, Defendant provides numerous services related to Wi-Fi including setting up, testing, operating, maintaining, and/or upgrading its customers' Wi-Fi

---

[3] *See* https://www.t-mobile.com/home-internet/plans/all-in-unlimited-internet-plan?icid=HEIS_ISW_U_24HMENET_5E132E168196F61042346.
[4] *See* https://www.t-mobile.com/home-internet/how-5g-home-internet-works?INTNAV=tNav%3AHowItWorks; https://www.t-mobile.com/home-internet/plans/rv-camper-internet-plans?INTNAV=tNav%3APlans%3AHomeInternetAwayplan.
[5] *See* https://wholesale.t-mobile.com/iot/device-certification/.

networks, including using the Accused Instrumentalities to practice one or more claims of the '720 patent.[6]

48. Furthermore, to the extent a party other than Defendant performs any step of the asserted method claims, such actions are attributable to Defendant under the theory of joint infringement. For example, Defendant contracts with third parties to offer Wi-Fi services utilizing access points, including with suppliers of such access points, businesses utilizing access points, and companies testing access points and other IoT devices.[7] As another example, Defendant requires device compatibility testing and certification by Defendant for use on Defendant's networks.[8]

49. The Accused Instrumentalities infringed and continue to infringe claim 19 of the '720 patent during the pendency of the '720 patent.

50. On information and belief, the Accused Instrumentalities are used, marketed, provided to, and/or used by or for each of Defendant's partners, clients, customers, and end users across the country and in this District.

51. USTA has been harmed by Defendant's infringing activities.

---

[6] *See* https://www.t-mobile.com/support/home-internet?INTNAV=tNav%3ASupport%3AGettingStarted; https://www.t-mobile.com/support/home-internet/t-mobile-gateway?INTNAV=tNav%3ASupport%3AWiFiGatewayDevice; https://www.t-mobile.com/support/home-internet/5g-gateway-g4ar; https://www.t-mobile.com/support/home-internet/home-internet-plus; https://www.t-mobile.com/support/home-internet/sagemcom-gateway; https://www.t-mobile.com/support/home-internet/arcadyan-gateway; https://www.t-mobile.com/support/home-internet/nokia-gateway.

[7] *See* https://www.t-mobile.com/business/solutions/iot/device-certification; https://wholesale.t-mobile.com/iot/device-certification/; https://www.t-mobile.com/support/home-internet/connect#:~:text=Go%20to%20your%20device%20settings,listed%20on%20your%20gateway%20label).

[8] *Id.*

## JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, USTA demands a trial by jury on all issues triable as such.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff USTA demands judgment for itself and against Defendant as follows:

    A.    An adjudication that Defendant has infringed the '720 patent;

    B.    An award of damages to be paid by T-Mobile adequate to compensate USTA for Defendant's past infringement of the '720 patent, and any continuing or future infringement through the date such judgment is entered, including interest, costs, expenses and an accounting of all infringing acts including, but not limited to, those acts not presented at trial;

    C.    A declaration that this case is exceptional under 35 U.S.C. § 285, and an award of USTA's reasonable attorneys' fees; and

    D.    An award to USTA of such further relief at law or in equity as the Court deems just and proper.

| | |
|---|---|
| Dated: July 29, 2025 | DEVLIN LAW FIRM LLC |

                                                   */s/ Timothy Devlin*_____
Timothy Devlin
tdevlin@devlinlawfirm.com
Derek Dahlgren (*pro hac vice* to be filed)
ddahlgren@devlinlawfirm.com
Srikant Cheruvu (*pro hac vice* to be filed)
scheruvu@devlinlawfirm.com
1526 Gilpin Avenue
Wilmington, Delaware 19806
Telephone: (302) 449-9010
Facsimile: (302) 353-4251

*Attorneys for Plaintiff*
*USTA Technology, LLC*